AMERICAN ELECTRIC POWER
SERVICE CORPORATION, et
al., Petitioners,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Elizabethtown Gas Company, American
Paper Institute, Inc., Brooklyn Union
Gas Co., Occidental Geothermal, Inc., In-
tervenors.

No. 80–1789.

United States Court of Appeals,
District of Columbia Circuit.

Argued 15 Sept. 1981.

Decided 22 Jan. 1982.

Rehearing Denied April 23, 1982.

Edward Berlin, Washington, D. C., with whom Roger Strelow, Thomas M. Lemberg and Robert S. Taylor, Washington, D. C., were on the brief for petitioners.

John A. Cameron, Jr., Atty., Federal Energy Regulatory Commission, Washington, D. C., with whom Jerome Nelson, Acting Gen. Counsel, Jerome M. Feit, Deputy Sol., A. Karen Hill and Glenn J. Berger, Attys., Federal Energy Regulatory Commission, Washington, D. C., were on the brief for respondent.

John T. Miller, Jr., Washington, D. C., was on the brief for intervenor, Elizabethtown Gas Company.

Rigdon H. Boykin, New York City, was on the brief for intervenor, American Paper Institute, Inc.

James E. Rogers, Jr., Washington, D. C., and Jeffrey D. Watkiss were on the brief for intervenor, Occidental Geothermal, Inc.

James Patrick Slattery, Brooklyn, N. Y., entered an appearance for intervenor, Brooklyn Union Gas Co.

Kathryn A. Oberly and Susan V. Cook, Attys., U. S. Dept. of Justice, Washington, D. C., were on the brief for amicus curiae, United States, urging that the Commission's order be upheld.

Robert H. Loeffler, Alan Cope Johnston and Henry D. Levine, Washington, D. C., were on the brief for amici curiae, Great Western Malting Co., et al. urging that the Commission's order be upheld.

Philip R. Mann, Solana Beach, Cal., was on the brief for amicus curiae, California Manufacturers Association, urging denial of the petition for review.

Before SPOTTSWOOD W. ROBINSON, III, Chief Judge, WILKEY and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

This appeal involves those provisions of the Public Utility Regulatory Policies Act of 1978 (PURPA) which deal with cogeneration and small power production,[1] and the rules promulgated by the Federal Regulatory Energy Commission ("FERC" or "Commission") to implement these provisions.[2] Petitioners, who are public utilities, challenge FERC on four specific issues. They are: (1) FERC's "full avoided cost" rule; (2) FERC's "simultaneous transaction" rule; (3) FERC's grant of blanket authority to cogenerators to "interconnect" with electric utilities without meeting the requirements of sections 210[3] and 212[4] of the Federal Power Act; and (4) FERC's failure to adopt "fuel use" criteria in determining what cogeneration facilities are "qualifying" facilities eligible for the benefits of PURPA.

We uphold FERC's actions with respect to the simultaneous transaction rule and fuel use. However, we find for the petitioners on the matters of the full avoided cost rule and interconnection, and vacate FERC's rules there.

## I. BACKGROUND

Cogeneration is the combined production of electrical power and useful thermal energy, such as heat or steam. Cogeneration usually refers to the use of heat that would otherwise be wasted after electricity is generated ("topping cycle"); the term also applies to systems that generate electricity

---

1. 16 U.S.C. §§ 796(17)–(18), 824a–3, 824i, 824k (Supp. III 1979).

2. 18 C.F.R. §§ 292.101–.602 (1980).

3. 16 U.S.C. § 824i (Supp. III 1979).

4. *Id.* § 824k.

from heat left over from an industrial process ("bottoming cycle"). Because both heat and electricity are created in a single process, about half as much fuel is used to produce electricity and heat as would be needed to produce the two separately. While cogeneration is not a new concept, its popularity had declined steadily since the turn of the century as energy from central station power plants became relatively inexpensive. With the rise in utility rates in recent years, however, it became apparent that cogeneration might again become economical on a broad scale.[5]

Small power production facilities, on the other hand, for the purposes of this case are those which use biomass, waste, geothermal resources, or renewable resources (including wind, solar energy, and water) to produce electric power. They may have a power production capacity no greater than 80 megawatts.[6]

The cogeneration and small power production provisions of PURPA were one part of a vast complex of five major statutes enacted in 1978, known jointly as the National Energy Act.[7] The provisions sought to encourage both sources of energy production.

Prior to the enactment of PURPA, a cogenerator or small power producer seeking to establish interconnected operation with a utility faced three major obstacles. First, utilities were often unwilling to purchase the other producers' electric output at all or were unwilling to pay an appropriate rate. Second, some utilities charged discriminatorily high rates for backup service to cogenerators and small power producers. Third, a cogenerator or small power producer which provided electricity to a utility ran the risk of being considered a public utility and subjected to extensive state and federal regulations.[8]

Congress[9] designed section 210 of PURPA[10] to remove these institutional barriers to the development of small power production and cogeneration. Under section 210, each electric utility is required to offer to purchase available electric energy from cogeneration and small power production facilities which obtain qualifying status under section 201[11]; the utility is also obliged to

**5.** See generally Comptroller General, U. S. General Accounting Office, Industrial Cogeneration—What it is, How it Works, its Potential (1980).

**6.** 16 U.S.C. § 796(17)(A) (Supp. III 1979). See also Federal Energy Regulatory Comm'n, Draft Environmental Impact Statement: Rulemaking for: Small Power Production and Cogeneration Facilities—Qualifying Status/Rates and Exemptions, Docket Nos. RM79–54 & RM79–55 (June 1980).

**7.** The five statutes were PURPA, Pub.L.No. 95–617, 92 Stat. 3117 (1978); National Energy Conservation Policy Act, Pub.L.No. 95–619, 92 Stat. 3206 (1978); Natural Gas Policy Act, Pub.L.No. 95–621, 92 Stat. 3350 (1978); Energy Tax Act, Pub.L.No. 95–618, 92 Stat. 3174 (1978); Powerplant and Industrial Fuel Use Act (hereinafter "Fuel Use Act"), Pub.L.No. 95–620, 92 Stat. 3289 (1978).

**8.** See, e.g., 123 Cong.Rec. 32403 (5 Oct. 1977) (remarks of Sen. Durkin); id. at 32419 (remarks of Sen. Hart); id. at 32437 (remarks of Sen. Haskell); Conference Report on the Public Utility Regulatory Policies Act, H.R.Rep.No. 1750, 95th Cong., 2d Sess. (1978); Executive Office of the President, The National Energy Plan 45 (G.P.O.1977); Commonwealth of Massachusetts, Cogeneration: its Benefits to New England (October 1978).

**9.** See congressional sources cited note 8 supra.

**10.** 16 U.S.C. § 824a–3 (Supp. III 1979).

**11.** Section 201 of PURPA defines a small power production facility as one which "produces electric energy solely by the use, as primary energy source, of biomass, waste, renewable resources, or any combination thereof," with a power production capacity not greater than 80 megawatts. Id. § 796(17)(A). A small power producer must use a specified "primary energy source" for all energy generation, except as required for emergency, maintenance, or quality control purposes. Id. § 796(17)(B).

Section 201 next defines a cogeneration facility as a producer of "(i) electric energy, and (ii) steam or forms of useful energy (such as heat) which are used for industrial, commercial, heating, or cooling purposes ...." Id. § 796(18)(A). Unlike the provisions governing small power producers, the statute does not specify maximum size or "primary energy source" limitations for the cogenerators. However, in order to qualify, a person "not primarily engaged in the generation or sale of electric power" must satisfy such requirements govern-

provide backup power and other services to such facilities on a nondiscriminatory basis. Section 210 further directs the Commission to "prescribe, and from time to time thereafter revise, such rules as it determines necessary to encourage cogeneration and small power production .... "[12] These rules are to implement the statutory requirement that electric utilities offer to sell electric energy to cogeneration and small power production facilities and to purchase electric energy generated at these facilities. Qualifying small power producers and qualifying cogeneration facilities may be exempted in whole or part by Commission rule from the Federal Power Act, the Public Utility Holding Company Act,[13] and state laws and regulations respecting rates and the financial or organizational regulation of electric utilities, if the Commission determines such exemption is necessary to encourage cogeneration and small power production.[14]

After giving notice and soliciting comments FERC issued its rules regarding cogeneration rates and exemptions on 19 February 1980.[15] On 15 March 1980 it issued its rules with respect to what cogenerators would be considered "qualifying facilities."[16] Petitioners challenge four facets of these rules.

First, FERC would order the states to set rates for purchases of power from qualifying cogenerators at a level that always (for facilities built after the enactment of the statute) equals the utilities' full "avoided" cost.[17] "Avoided" cost refers to the incremental cost the utility would bear if it were required itself to supply the electricity produced by the cogenerator.[18]

Second, FERC would require utilities, at the cogenerator's option, to engage in a "simultaneous purchase and sale" by which the utility is deemed to have purchased all the cogenerated power, even that used by the cogenerator for itself, and to have sold to the cogenerator the power the cogenerator uses internally.[19]

Third, the Commission by rule[20] made a blanket grant of authority to cogenerators to interconnect with utilities without meeting the substantive and procedural requirements of the Federal Power Act's sections 210[21] and 212,[22] which were added to and amended by sections 202[23] and 204[24] of PURPA.

Fourth, the Commission would not include criteria relating directly to "fuel use" in its rules with respect to what cogenerators are to be deemed "qualifying facilities."[25]

We shall consider each of these issues in turn.

ing minimum size, fuel use, and fuel efficiency "as the Commission may, by rule, prescribe ...." *Id.* § 796(18)(B).

12. *Id.* § 824a–3(a).

13. *Id.* §§ 79 to 79z–6.

14. *Id.* § 824a–3(e).
 Hereinafter in this opinion all references to cogenerators will also apply, unless otherwise stated, to small power producers.

15. 18 C.F.R. §§ 292.101, .301–.602 (1980) (Order No. 69).

16. *Id.* §§ 292.201–.207 (Order No. 70).

17. *Id.* §§ 292.304(b)(2)–(4).

18. *Id.; id.* § 292.304(e).

19. *Id.* § 292.304(b)(4).

20. *Id.* § 292.303(c)(1).

21. 16 U.S.C. § 824i (Supp. III 1979).

22. *Id.* § 824k.

23. *Id.* § 824i.

24. *Id.* § 824k.

25. FERC did include fuel use criteria in defining qualifying small power production facilities; indeed, it was required by statute to do so. *Id.* § 796(17)(A)(i).

## II. ANALYSIS

### A. Full Avoided Cost [26]

Section 210, "Cogeneration and small power production," of PURPA reads in relevant part:

(b) RATES FOR PURCHASES BY ELECTRIC UTILITIES

The rules prescribed [by FERC] . . . shall ensure that, in requiring any electric utility to offer to purchase electric energy from any qualifying cogeneration facility or qualifying small power production facility, the rates for such purpose—

(1) shall be just and reasonable to the electric consumers of the electric utility and in the public interest, and

(2) shall not discriminate against qualifying cogenerators or qualifying small power producers.

No such rule prescribed . . . shall provide for a rate which exceeds the incremental cost to the electric utility of alternative electric energy.[27]

Sections 292.304(b)(2) and (b)(4) of FERC's rules require utilities to purchase electricity from qualifying facilities at a rate that "equals" each utility's full avoided cost.[28] By requiring the utility to pay the cogenerator exactly what it would have cost the utility to produce the power itself or buy from another source, these rules foreclose the states, unless they apply for and receive a waiver from FERC, from ordering the sharing of any of the benefits of the transaction with the other customers of the utility.

The question before us is whether this result is consistent with the statutory mandate that the rates set by the Commission must, in addition to not discriminating against cogenerators, also be "just and reasonable to the electric consumers of the electric utility" and "in the public interest." We hold that FERC has not adequately justified its adoption of the full avoided cost standard. Therefore the FERC rule is vacated and the matter remanded to the Commission.

Congress could have required the Commission to set rates at full avoided cost.

---

**26.** The Commission has challenged the standing of petitioners with respect to the full avoided cost and simultaneous transaction issues. It also challenges the ripeness of the full avoided cost issue. We find both challenges to be without merit.

It is well established that "one who has been injured by agency action is presumptively entitled to judicial review." *City of Rochester v. Bond*, 603 F.2d 927, 931 (D.C.Cir.1979). The injury which the full avoided cost rule causes the petitioners is clear. If petitioners prevail before this court, the rule will be changed to permit the states to allow the petitioners to purchase electricity at prices lower than those now required. Nor do we find persuasive FERC's argument that utilities nevertheless cannot be aggrieved because they will "recover their costs in the regulated rates they charge their customers." A utility might or might not be allowed to raise its rates after a likely, lengthy, and costly proceeding before the state utility commission. (The divergent interests of the utilities and the state commissions lead us also to reject FERC's argument that utilities should find the full avoided cost rule unobjectionable since FERC's rule 18 C.F.R. § 292.403 (1980) allows "the State regulatory authority" to apply to FERC for a waiver of the rule.)

Moreover, public utilities have an obligation to minimize their costs consistent with their obligation to provide adequate service. *See*

*Texas E. Transmission Corp. v. FPC*, 414 F.2d 344 (5th Cir. 1969), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1817, 26 L.Ed.2d 89 (1970). Furthermore, utilities have consistently been allowed to challenge set rates. *See, e.g., Public Sys. v. FERC*, 606 F.2d 973 (D.C.Cir.1979); *Sierra Pac. Power Co. v. FPC*, 223 F.2d 605 (D.C.Cir.1955), *aff'd*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956). And finally, the Federal Power Act at 16 U.S.C. § 825*l* (1976) grants petitioners, as "person[s] . . . aggrieved," standing to challenge FERC's regulations. *See Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir. 1970); *National Coal Ass'n v. FPC*, 191 F.2d 462 (D.C.Cir.1951).

As for ripeness, the Federal Power Act precludes review of Commission orders unless sought within 60 days of the Commission's order on rehearing. 16 U.S.C. § 825*l*(b) (1976). Thus if the petitioners fail to pursue their remedies now, they do so at the peril of losing the right ever to challenge the validity of the Commission's regulations.

**27.** 16 U.S.C. § 824a–3(b) (Supp. III 1979).

**28.** 18 C.F.R. §§ 292.304(b)(2)–(4) (1980). What the Commission there calls its full "avoided" cost standard is identical to the statutory concept of the "incremental cost . . . of alternative energy."

However, Congress did not do so. Instead it specified the three other criteria—the "public interest," and the interests of co-generators and "electric consumers of electric utilit[ies]"—which the Commission was to consider in setting rates. It is apparent that the Commission did not do this, or at least if it did its rationale and process of consideration were never made explicit. Instead the Commission came to the simplistic and uniform conclusion that the full avoided cost standard would be just and reasonable in every case and that this was necessary to encourage cogeneration in every case.

Congress' *Conference Report on the Public Utility Regulatory Policies Act*[29] makes clear that section 210(b)'s incremental cost *limitation* is not to become a substitute for the "just and reasonable" standard.

> [T]he utility would not be required to purchase electric energy from a qualifying cogeneration or small power production facility at a rate which exceeds the lower of the rate described above, namely .a rate which is just and reasonable to consumers of the utility, in the public interest, and nondiscriminatory, or the incremental cost of alternate electric energy. This limitation on the rates which may be required in purchasing from a cogenerator or small power producer is meant to act as an *upper limit* on the price at which utilities can be required under this section to purchase electric energy.[30]

By ordering that the purchase rate be equal to the full avoided cost in every case, FERC has, without convincing explanation, simply adopted as a uniform rule the maximum purchase rate specified in the statute. Congress made a clear distinction between a "just and reasonable" rate and a rate based

on the full avoided cost, though the two *may* coincide. It has long been held that the essence of the just and reasonable standard is a balancing of the interests of the affected parties.[31] Although FERC was *not* to subject cogenerators to complex, traditional utility-type regulation, it was compelled to consider the hard questions which the standard necessarily raises.

█ The Commission's brief points out, correctly, that the *Conference Report* stated that "the purchase by the utility of the cogenerator's or small power producer's power should not be burdened by the same examination as are utility rate applications, but rather in a less burdensome manner."[32] This sentence, however, does not stand for the proposition that cogenerator applications are to be given *no* examination, but— as the sentence itself says—that these examinations are simply to be conducted "in a *less* burdensome manner." However unburdensome this manner might be, it requires at a minimum that the Commission make clear and explain how the rates it sets are consistent with the statutory criteria. In the case at hand this was not done.

█ The Commission gave only three reasons for the adoption of its standard. It stated that any benefits to utility customers would lead to "insignificant" rate reductions, that a "split-the-savings" rule would result in precisely the sort of utilities-type regulation which PURPA was designed to avoid, and that allocating all the savings to cogenerators "may provide a significant incentive for a higher growth rate of these technologies."[33] We find these reasons inadequate.

█ Since the Commission is required by statute to consider the impact of its rate setting on "electric consumers of the electric utility" it is especially necessary for

---

**29.** Conference Report on the Public Utility Regulatory Policies Act, H.R.Rep.No. 1750, 95th Cong., 2d Sess. (1978).

**30.** *Id.* at 98 (emphasis added).

**31.** *See, e.g., FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944).

**32.** Conference Report on the Public Utility Regulatory Policies Act, H.R.Rep.No. 1750, 95th Cong., 2d Sess. 98 (1978).

**33.** Record at 3457–60. Compare this with the extensive rationale given by FERC for its nonadoption of fuel use criteria, discussed at pp. 1241–1245 *infra.*

FERC to demonstrate the factual basis for its conclusion of "insignificant" savings for them. The Commission should bear in mind, as Congress surely knew, that inevitably the impact of FERC's rules per consumer will be less than their impact per cogenerator. Moreover, it is possible that if cogeneration becomes substantial, a rate uniformly set at the statutory ceiling may be quite costly to electric consumers. The Commission may be right in its conclusion, but it needs to make its reasoning and findings explicit.

■ Similarly, the Commission's assertion that a split-the-savings rule would require utilities-type regulation in contravention of the purpose of PURPA is inadequate. FERC appropriately rejected a split-the-savings approach, which would involve calculation of cogenerator costs, since such rate setting would indeed veer toward the public utilities-style rate setting that Congress wanted to avoid. But as the Commission recognizes, there are alternatives to the full avoided cost rule besides the split-the-savings approach, and these may require *no* consideration of the cogenerator's costs. The Commission recognizes, for instance, that it could have permitted state authorities to set purchase rates at some percentage of avoided cost.[34] This approach would not necessarily require any inquiry into the cogenerator's costs, but only into those of the utility.

■ Finally, in rejecting even this "percentage" alternative to the full avoided cost rule, the Commission asserts that any rate below the statutory maximum it has adopted might be insufficient to induce some potential cogenerators either to begin or to continue to cogenerate.[35] Thus, the Commission holds that the bare, unquantified possibility that a rule permitting rates at less than full cost *might* be insufficient to encourage the last kilowatt hour of cogeneration justifies shutting the utility's customers out of any share of the benefits. But this seems entirely inconsistent with the clear intent of section 210(b), which seeks to strike a balance among the interests of cogenerators, "electric consumers of electric utilit[ies]," and the "public interest." FERC should allocate the benefits more evenly between the cogenerators and the utilities if the utilities can demonstrate that, under a percentage of avoided cost approach, an allocation less heavily favoring the cogenerators is in the public interest and the interest of the utilities' electric consumers, and will not disproportionately discourage cogeneration.

It is clear that FERC has failed to meet its obligation to provide the public with the reasoned consideration, decisionmaking, and opinion which it is required to give.[36] On remand we expect the Commission to take a harder look at, especially, the percentage of avoided cost approach. Such an approach might, for example, entail FERC setting a specific percentage, or FERC might permit state commissions to set rates within a range—*e.g.*, 80–100 percent—authorized by the Commission.

We shall now outline some additional concerns raised by the full avoided cost rule, which the Commission should address in its subsequent rulemaking.

It is clear that at least the possibility exists that setting the rates which utilities must pay to cogenerators at too high a level may hurt both "the electric consumers of the electric utility" and the "public interest." This may occur, for example, where the utility is subject to higher pollution control standards than are cogenerators, or when it pays taxes at a higher rate than will cogenerators. In such cases the Commission's rule would presumably violate both the "public interest" and the "just and reasonable" standards of the Act, unless FERC found that the cogenerator provided sufficiently countervailing external public benefits. While we recognize that such costs may not be easily quantifiable, especially at this initial stage of regulation, the

---

**34.** Record at 3459.

**35.** *Id.* at 3460.

**36.** *See generally Public Sys. v. FERC*, 606 F.2d 973 (D.C.Cir.1979).

Commission may find it possible to take them into account.

Furthermore, if a utility has excess capacity the additional cogeneration encouraged by full avoided cost payments will result in higher rates for all remaining customers of the utility, because that cogeneration will reduce the number of customer-purchased kilowatt-hours over which the utility can spread a share of the fixed costs of that extra capacity. While the regulations will not thereby increase the utility's total cost, they will increase the share of those costs borne by each remaining customer. So long as the regulations largely preclude those remaining customers from receiving any offsetting benefit that would result from purchase rates below full avoided cost, the regulations will make those customers—the beneficiaries of the just and reasonable standard—worse off.

Likewise, *the full avoided cost rule may disadvantage utility customers in other ways.* But for FERC's regulations, the utility may have paid a cogenerator a market purchase rate of something less than the full avoided cost, under a standard industry practice.[37] Since a rate which is below full avoided cost, but still above the cogenerator's cost, could suffice to induce cogeneration, a full avoided cost rule would not be required to meet the statutory directive to encourage cogeneration. Thus, by requiring the payment of full avoided cost to any new cogeneration facility (including those which would have been installed even though purchase rates are less than full avoided cost), the regulations could both fail to induce additional cogeneration and leave the utility and its customers worse off than they might otherwise have been.

█ We do not say, of course, that the Commission must adopt rules which have no adverse impact on electricity consumers. But we do say that the Commission must consider the rules' impact on these consumers and the public interest in striking the proper balance.

While Congress chose to regulate the market because utilities in the past acted to prevent the participation of cogenerators in the market,[38] the statute does not preclude all consideration of market forces. *Indeed, the command that the interests of consumers and the public be taken into account contemplates consideration of the degree to which market forces may encourage utilities to purchase, and cogenerators to sell, a substantial amount of cogenerated power at a price lower than the statutory limit.*

Cogenerative facilities are no monopoly. They are variously located, they depend on various types of power generation, they have varying excess of power at different times to sell, and the public utilities to which they sell also have varying demands for additional power. There is nothing very uniform about either the cost or quantity or location or availability of the power generated by any cogenerative source, and the utility to which it sells has many other power sources, including other cogenerators, from which to choose.

This is precisely the type of situation which, assuming that utilities are similarly competitively constrained, the market pricing system admirably regulates, without the intervention of any government agency. The cogenerative sources are not monopolies in any way, for they simply compete in selling power to the public utility, much as the coal companies or the petroleum companies sell power to the public utility. Thus, if the market were competitive, regulation would be unnecessary and market forces would adjust between the public utility's demand and the cogenerative sources' supply to yield the price and quantity of cogenerative power sold to the public utility. If the public utility's need in a particular area were less, it would buy less, and possibly a

---

**37.** There is a traditional manner in the electric utility industry by which two entities which exchange power determine the price of that power, the so-called split-the-savings approach; the price is set somewhere between the incremental cost of the buying utility and the incre- mental cost of the selling utility, so that each benefits by the transaction. *See* Record at 3455–56.

**38.** *See* pp. 1230–1231 *supra.*

smaller amount of cogenerative power would be encouraged. But *by this price mechanism the consumer would benefit* by having available additional power at a lower cost than the utility could itself generate that power, and the cogenerative source would benefit by selling power it did not need. It may be possible for the Commission to examine the market forces and set a price, or a price range, for cogenerated power that will allocate to the consumer some of the benefits of a competitive market.

It is this sensitive market mechanism which historically and repeatedly the federal regulatory agencies have found so extremely difficult to replicate. Congress clearly wanted to avoid the stultifying effects of complete public utility regulation in the competitive situation here where it was obviously not needed, although a purely market pricing mechanism for cogenerative power might have been thought incompatible with public utility regulation of the principal source. The mandate of the agency is to balance the interests of cogenerators, consumers, and the public interest. This will be a complex matter, but it is the duty of the agency to try, which apparently it has not done so far. If the agency finds it impossible to achieve by regulatory rules an equitable balance of interests, then it should advise Congress of what is needed in the way of statutory change to achieve the congressional objectives of consumer protection and development of additional power sources.

■ The upshot of the above is that where competitive forces exist, the Commission should take them into account in determining the degree and type of regulation necessary. Cogenerators are in the same position as coal or oil producers—if they are offered a sufficient price by the public utilities and are relieved from burdensome utility-type regulation, they will produce the needed power and sell it to the public utilities. One reason that these sources have not done so before is that they feared regulation as public utilities. The law which

Congress passed was intended to correct the market distortions caused by government regulations and by the utilities—not to create new ones.

■ The above discussion assumes that the utilities, as well as the cogenerators, are subject to some competitive restraints. If, on the other hand, the utilities are monopsonists with respect to cogenerators, then the Commission may be justified in its present regulation of rates charged by utilities. However, this is precisely the sort of determination which FERC should make explicit and explain, and it has not done so. Moreover, even if the utilities are monopsonists, it does not necessarily follow that the proper rate level is at full avoided cost. Again, the Commission must explain why the level was set here rather than somewhere else.

■ We hold therefore that FERC must justify and explain its decision to prohibit in an across-the-board manner rates below full avoided cost. Since it has failed to do so, its rule is vacated.

We recognize that it would probably be an untoward burden and expense to determine permissible rates on a case-by-case, or perhaps even on a cogeneration method-by-cogeneration method basis. Such a requirement would, in fact, be inconsistent with the overarching congressional intent to streamline rather than impede the implementation of cogeneration. Thus our holding should not be read as requiring FERC to establish different standards for a variety of cogeneration cases and methods. A general rule is acceptable, but the Commission must justify and explain it fully, particularly in its balancing of the interests of cogenerators, the public interest, and "electric consumers of the electric utilit[ies]."

B. *Simultaneous Purchase and Sale* [39]

A customer of a utility who needs electric energy for his own industrial purposes may produce it at his own plant or buy it from the local utility. However, if such a cus-

**39.** *See* note 26 *supra*.

tomer is unable simultaneously to buy from, and sell power to, the utility, he will generally find it uneconomical to generate energy himself even though he may be able to do so more efficiently than the utility. That is not an unusual situation in view of the fact that a utility's retail rate is generally lower than the utility's incremental cost of producing additional capacity or energy.[40] In such circumstances, the prudent customer will allow the utility to build and operate the more expensive plant and supply customers, even though the utility's plant will cost society more than if the customer built a generating plant.

The regulations promulgated by FERC permit a cogenerator, at his option, to indulge in the fiction that the electricity he generates for his own use is simultaneously purchased by a utility and sold back to him.[41] The regulations enable new qualifying small power producers and cogenerators to sell to the utility all of their electric output at the purchasing utility's full avoided cost, and to purchase from the utility any electricity they may need at the traditional retail rate.

Petitioners challenge this rule on two plausible grounds. First, they argue that the Commission has misconstrued the statutory terms "purchase" and "sale." That is, they argue that because the rule here requires utilities to treat cogenerators as if they have engaged in a purchase and sale when in fact none might have occurred, it is violative of the plain meaning of section 210(a) of PURPA, under which the rule was promulgated:

> [The Commission shall] prescribe ... such rules as it determines necessary to encourage cogeneration and small power production which rules require electric utilities to offer to—
>
> (1) *sell* electric energy to qualifying cogeneration facilities and qualifying small power production facilities and

(2) *purchase* electric energy from such facilities.[42]

Yet it is clear, and petitioners conceded at oral argument, that FERC could have achieved the identical result where the cogenerator in fact engages in an actual sale of all his output to, and an actual purchase of all his input from, the utility. It would be anomalous indeed to treat differently the cogenerator who consumes all the power he generates and one who sells his surplus. Under these circumstances it seems unlikely that Congress intended the narrow definition of "purchase" and "sale" which petitioners urge upon us.

Moreover, it is arguable that the statute itself impels the simultaneous transaction rule. The statute requires non-discriminatory rates for cogenerators, and it is at least plausible that the Commission could find that *not* invoking a simultaneous transaction rule would in fact result in cogenerators paying discriminatory rates. That is, in the absence of a simultaneous transaction rule and assuming that there was no physical purchase or sale between the utility and the cogenerator, the person who chose to cogenerate would pay more for his power than the person who chose to buy from a utility. As discussed earlier,[43] this is a result of the structure of utility rates and can happen even if the cogenerator can generate energy more efficiently than the utility, since the cogenerator must pay his cost of cogeneration and the non-cogenerator must pay only the relatively and artificially lower utility retail rates. Moreover, as was explained in the preceding paragraph, in the absence of FERC's rule the cogenerator who consumes all his power would be treated (discriminatorily) differently from one who sells his surplus. Under these circumstances the Commission could properly require that these effects be avoided by adopting, as it did here, a simultaneous transaction rule.

---

**40.** The retail rates of utilities have traditionally been based on embedded—*i.e.*, average—costs which are normally less than incremental costs.

**41.** 18 C.F.R. § 292.304(b)(4) (1980).

**42.** 16 U.S.C. § 824a–3(a) (Supp. III 1979) (emphasis added).

**43.** *See* p. 1236 *supra*.

Finally, it should be borne in mind that one of the most basic purposes of PURPA was to remove the obstacle to cogeneration involved here: utilities were often unwilling to purchase the electric output at all or at an appropriate rate from cogenerators.[44] Under these circumstances we are inclined to give a great deal of deference to FERC's regulations.[45]

Petitioners' second complaint is that the Commission did not adequately consider and explain its decision to require utilities to engage in the simultaneous transaction fiction. Petitioners' argument here parallels its challenge to the Commission's adoption of the full avoided cost rule.

 While we find for petitioners on the latter point, we believe that in the matter of the simultaneous transaction fiction the Commission's consideration and explanation of its decision were adequate. The questions begged by the Commission's scanty findings with respect to its adoption of the full avoided cost rule are not raised in the context of its simultaneous transaction rule. The Commission considered the impact on consumers of its rule and concluded that "the utility's customers would benefit whenever a [cogenerator] builds a lower-cost plant than the utility can build, [so] we tentatively recommend that this simultaneous buying and selling be permitted in connection with new facilities."[46] As this passage also indicates, the Commission's simultaneous transaction rule is limited to new qualifying small power producers and cogenerators.

That the Commission considered the impact of its rule on all interested parties is reflected in its "Notice of Proposed Rulemaking Regarding the Implementation of Section 210 of the Public Utilities Regulatory Policies Act of 1978":

As observed in the Staff discussion paper, an efficient use of society's resources requires that when there is a need for additional capacity, and a utility's customer can construct a new plant more cheaply than a utility can, he should be encouraged to do so. A qualifying facility may have previously used a portion of its electric output to supply its own power needs. That it chose to generate its own electric power, rather than purchase such power from an electric utility, indicates that there were sufficient economic incentives to so act. To permit such a facility to sell that portion of its electric output to the utility at the utility's avoided costs and replace that electricity from the electric utility at non-incremental (and presumably lower) rates would increase the purchase power costs of the purchasing utility and thus would increase the rates charged to the utility's other customers. The Commission believes that it is not necessary to the encouragement of cogeneration and small power production that a qualifying facility be permitted to obtain avoided cost-based rates for this portion of its electric output. Accordingly, the Commission proposes that for energy generated by a new facility or by capacity installed after the date of issuance of these rules, a qualifying facility be permitted to sell its output at rates established under the section 210(b) of PURPA pricing mechanism while simultaneously purchasing electric energy from a utility pursuant to its retail rate schedules.[47]

Thus we find FERC's rule to be consistent with PURPA and to have been adequately justified by the Commission. Accordingly, we uphold the rule.

### C. *Interconnection*

An "interconnection" is a physical connection that permits electricity to flow

---

44. *See* pp. 1230–1231 *supra*.

45. Of course, this deference does not extend to regulations not promulgated in conformity with the statute. *See* Part II–A, pp. 1232–1237 *supra*, and Part II–C, pp. 1238–1241 *infra*.

46. Record at 2417.

47. FERC, Notice of Proposed Rulemaking Regarding the Implementation of § 210 of the Public Utilities Regulatory Policies Act of 1978, at § 292.107 (18 Oct. 1979) (footnote omitted), *reprinted in* Record at 2702–47 to 2702–48.

from one entity to another. The interconnections at issue here are not the usual ones by which a customer takes power *from* a utility but rather those which permit a cogenerator to transmit electricity *to* a utility. Petitioners argue that one of the rules promulgated by FERC is inconsistent with the Federal Power Act (FPA), as amended and added to in relevant part by PURPA. We agree.

We turn first to the statutes. FPA section 210(c)[48] provides that the Commission may issue an interconnection order with respect to a qualifying cogenerator *only if* the interconnection is in the public interest; would encourage overall conservation of energy or capital, optimize the efficiency of the use of facilities and resources, or improve a utility system's reliability; and meets the requirements of FPA section 212[49] that, inter alia, the interconnection is not "likely to result in a reasonably ascertainable uncompensated economic loss" for any utility or cogenerator, will not place an "undue burden" on any party, will not "unreasonably impair the reliability" of the utility, and will not "impair" the utility's ability "to render adequate service to its customers." FPA section 210(b)[50] provides that the Commission is to give appropriate notice and afford an evidentiary hearing before issuing any such order, and FPA section 212 contains certain specific financial and procedural protections for the party ordered to interconnect (for these purposes, the utility). Section 210(a)(1) of the FPA, as added to and amended by PURPA, states:

> Upon application of any electric utility, Federal power marketing agency, qualifying cogenerator, or qualifying small power producer, the Commission may issue an order requiring—

(A) the physical connection of any cogeneration facility, any small power production facility, or the transmission facilities of any electric utility, with the facilities of any such applicant . . . . [51]

Finally, and most significantly, section 210(e)(3) of PURPA states:

> No qualifying small power production facility or qualifying cogeneration facility may be exempted under this subsection from—
>
> . . . .
>
> (B) the provisions of section 210, 211, or 212 of the Federal Power Act . . . or the necessary authorities for the enforcement of any such provision of the Federal Power Act . . . . [52]

Against this statutory background, FERC promulgated rule 292.303(c)(1), which reads:

> 292.303 *Electric utility obligations under this subpart.*
>
> . . . .
>
> (c) Obligation to interconnect.
>
> (1) . . . [A]ny electric utility shall make such interconnections with any qualifying facility as may be necessary to accomplish purchases or sales under this subpart.[53]

Petitioners assert, and we find, that this rule is inconsistent with the statutes.

By requiring *"any"* utility to make interconnections with *"any"* cogenerator FERC designates, the Commission would in effect exempt qualifying cogenerators from the other procedural and substantive requirements discussed above in FPA sections 210 and 212, and deprive utilities of the safeguards afforded by those provisions. Section 210(e)(3) of PURPA makes clear that FERC may not do this: "No . . . qualifying cogeneration facility may be exempted . . . from the provisions of section 210, 211, or 212 of the Federal Power Act . . . or the necessary authorities for enforcement

---

48. 16 U.S.C. § 824i(c) (Supp. III 1979).

49. *Id.* § 824k.

50. *Id.* § 824i(b).

51. *Id.* § 824i(a)(1).

52. *Id.* § 824a–3(e)(3).

53. 18 C.F.R. § 292.303(c)(1) (1980). The "subpart" referred to is "Subpart C—Arrangements Between Electric Utilities and Qualifying Cogeneration and Small Power Production Facilities Under Section 210 of the Public Utility Regulatory Policies Act of 1978."

of any such provision under the Federal Power Act . . . ." [54]

■ FERC argues that compliance with the literal meaning of the statutory sections would impose an undue burden upon cogenerators. However, the Commission need not impose substantial administrative burdens on those facilities, but rather can adopt streamlined procedures. If the Commission believes that even streamlined procedures are too burdensome, the necessary amendment must come from Congress. FERC's argument extolling the wisdom and popularity of its interpretation is necessarily unavailing when Congress has explicitly chosen a policy to the contrary. As much can be said of the Commission's arguments that the procedures of FPA sections 210 and 212 and PURPA, respectively, would add nothing to the utilities' safeguards built into the Commission's rule on interconnection. The Commission cannot justify its transgression of the statute by saying that it is not convinced that it makes any difference.

The Commission also offers the following argument:

. . . [S]ection 212(e) of the Federal Power Act states that no provision of the interconnection requirements of the Federal Power Act shall be treated "(1) as requiring any person to utilize the authority of such section 210 or 212 [of the Federal Power Act] in lieu of any authority of law, or (2) as limiting, impairing, or otherwise affecting any other authority of the Commission *under any provision of law*" [emphasis supplied]. As this language plainly shows, the interconnection provisions of the Federal Power Act do not provide the exclusive remedy, where the requirements of Section 210 of PURPA—*i.e.*, "any other provisions of law"— are satisfied.[55]

■ We find this argument to be wholly unconvincing. FERC contends that the au-

thority it has to encourage cogeneration— one tool for which, it argues, is to grant authority for cogenerators to interconnect with utilities without meeting the other requirements of sections 210 and 212 of the Federal Power Act—cannot be attenuated by other statutory provisions. That is, FERC argues that it has been given specific authority to make the interconnection rule and that other statutory provisions cannot be read as limiting that authority. This assumes the conclusion. It is true that section 212(e) of the FPA was intended to keep specific grants of authority from being vitiated by the general limitations on authority in sections 210 and 212. However, in the case at hand, there is no specific grant of authority involved. Instead, we have a relatively *specific limitation* on authority in PURPA section 210(e)(3) which must control over the relatively *general grant* of authority in FPA section 212(e). The general directive of section 212(e) does not give the Commission a mandate to consign detailed provisions of PURPA itself to· the wastebasket as meaningless surplusage. It is well established that

[h]owever inclusive may be the general language of a statute, it "will not be held to apply to a matter specifically dealt with in another part of the same enactment. . . . Specific terms prevail over the general in the same or another statute which might otherwise be controlling."[56]

■ Finally, FERC argues that rule 292.303(c)(1) is consistent with PURPA section 210(e)(3) if the latter is interpreted as protecting cogenerators who are *targets* of *other* parties seeking interconnection, and not extended to situations where the cogenerator is an *applicant* for an interconnection itself. While an interesting and not inherently implausible suggestion, the Commission points to no evidence in the legislative history or the statute itself to justify this

---

**54.** 16 U.S.C. § 824a–3(e)(3) (Supp. III 1979).

**55.** Brief for Respondent at 64 (brackets in the original).

**56.** *Clifford F. MacEvoy Co. v. United States*, 322 U.S. 102, 107, 64 S.Ct. 890, 893, 88 L.Ed. 1163 (1944) (quoting *D. Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208, 52 S.Ct. 322, 323, 76 L.Ed. 704 (1932)).

interpretation, which is both counterintuitive and inconsistent with the statute's explicit provisions. Nor were we able to find such evidence. Accordingly, we reject the interpretation. The Commission's interconnection rule is hereby vacated.

### D. *Fuel Use*

Section 201 of PURPA states:
"qualifying cogeneration facility" means a cogeneration facility which—
(i) the Commission determines, by rule, meets such requirements (including requirements respecting minimum size, *fuel use,* and fuel efficiency) as the Commission *may,* by rule, prescribe . . . . [57]

The Commission decided against including any fuel use criteria in its definition of qualifying cogeneration facilities. Petitioners challenge this decision as violating the statutory language quoted above, and advocate criteria aimed at limiting oil- and gas-fired cogeneration. FERC argues that the statutory language, on the contrary, gives it the discretion to decide whether or not to include fuel use requirements.

We agree with the Commission for two reasons. First, FERC was not required to establish separate fuel use criteria since the statute says *may,* not must. Second, the regulations it adopted were a reasoned, adequate response to the charge Congress gave it. We consider the two reasons in turn.

#### 1. *Statutory interpretation*

The Supreme Court has repeatedly emphasized that "the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." [58] The analysis of this court in *Sierra Club v. Costle* [59] is instructive here, too. In that case we rejected an argument that an agency lacked discretion to adopt emission reduction standards for coal-burning facilities that varied according to the sulfur contents of coal. As we said there, "The absence of any express mandate in this language to adhere to a single percentage reduction standard critically undercuts Sierra Club's arguments that EPA could not vary the standard . . . ." [60] Thus, in the case at hand, in the absence of clear legislative intent to the contrary we decline to read "may" to mean anything but "may." [61] Since the construction of the statute in accordance with its plain meaning does not produce an absurd result, render the statute internally contradictory, or diverge from legislative intent unequivocally expressed in the statute's history, departure from the plain meaning is not warranted. [62]

Other evidence reinforces our conclusion that this interpretation of the statute is the correct one. The Commission reasoned that Congress did not intend to exclude oil- and natural gas-fired cogenerating facilities from qualifying status, because if that were the congressional intent the statute itself would have contained such a restriction, as it did for small power producers. [63] Moreover, the Commission noted that its inter-

---

**57.** 16 U.S.C. § 796(18)(B) (Supp. III 1979) (emphasis added).

**58.** *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). *See also Lewis v. United States,* 445 U.S. 55, 60, 100 S.Ct. 915, 919, 63 L.Ed.2d 198 (1980); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979) (and cases cited therein); *Southeastern Community College v. Davis,* 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979) (and cases cited therein); *Reiter v. Sonotone Corp.,* 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979); *United States v. Wiltberger,* 18 U.S. (5 Wheat.) 76, 96–97, 5 L.Ed. 37 (1820).

**59.** 657 F.2d 298 (D.C.Cir.1981).

**60.** *Id.* at 318.

**61.** The petitioners' citation of *Calvert Cliffs' Coordinating Comm., Inc. v. Atomic Energy Comm'n,* 449 F.2d 1109, 1112–13 (D.C.Cir. 1971), is therefore inapposite. In *Calvert Cliffs'* the statute involved used mandatory language ("shall"), not discretionary language ("may").

**62.** *See, e.g., Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978).

**63.** 16 U.S.C. § 796(17)(A)(i) (Supp. III 1979).

pretation was consistent with the Natural Gas Policy Act of 1978,[64] which expressly allows for exemption from incremental pricing for natural gas used in qualifying cogeneration facilities.[65]

The Commission also concluded that any fuel use restrictions it imposed would apply only to the small facilities Congress had exempted from the Fuel Use Act.[66] By including "fuel use" among the factors that the Commission may consider when qualifying cogenerators, Congress cannot be assumed to have intended to bring small facilities, otherwise exempted, under regulation by the Fuel Use Act just because they seek to become cogenerators. This is underscored by the fact that Congress sought to encourage cogeneration by providing an exemption from fuel use restrictions under the Fuel Use Act for large facilities if they become cogenerators.[67] The Commission concluded that restricting the fuels used by prospective cogeneration facilities if they become cogenerators could simply discourage cogeneration without reducing consumption of oil or natural gas.[68]

Moreover, it should be pointed out that while the conservation of oil and gas was one reason behind the passage of PURPA, it was not the sole reason. The more overarching reason was the efficient allocation and use of this nation's electric energy supplies.[69] Thus petitioners cannot argue that *any* policy which might increase the amount of oil and gas used is ipso facto a violation of PURPA, especially when, as here, the language of PURPA specifically authorizes the regulations promulgated. Indeed, the Commission noted that one of PURPA's express purposes is to accomplish "increased conservation of electric energy, increased efficiency in the use of facilities and resources by electric utilities, and equitable

retail rates for electric consumers,"[70] and apparently found that fuel use criteria would have the opposite effect, reducing efficient use of facilities and resources.[71] It is also worth noting that Congress was surely cognizant of the rapidly changing nature of the oil and gas import market. The Commission could plausibly argue that the necessity of encouraging every conceivable stopgap measure in order to decrease the reliance on imported oil and gas has declined today from the paramount importance it may have had three years ago when the bill was passed.

### 2. *FERC's reasoned and adequate consideration*

Turning to the second reason for our upholding of the Commission on this issue, it is clear to us that the regulations promulgated by FERC under the statute were a reasoned and adequate response to the charge Congress gave it. To outline the course of our discussion in this section, we find that FERC considered the advantages and disadvantages of fuel use criteria, but concluded that the burdens they would place on cogeneration, the presence of FERC's fuel *efficiency* criteria, the power of the Department of Energy (DOE) to restrict the fuel use of the largest cogeneration facilities, and the relative pricing of non-petroleum utility power all rendered fuel use criteria unnecessary and undesirable.

In this discussion of why the court concludes that the Commission's rules are reasoned and adequate, two general points should be kept in mind. First of course is that the entire discussion takes place against the background of our prior finding of discretion for the Commission, so that the most the Commission need show is that

---

64. Record at 2183. The Natural Gas Policy Act of 1978 is codified at 15 U.S.C. §§ 3301–3432 (Supp. III 1979); 42 U.S.C. § 7255 (Supp. III 1979).

65. 15 U.S.C. § 3346(c)(3) (Supp. III 1979).

66. Record at 370; *see* 42 U.S.C. §§ 8302(a)(7), (10) (Supp. III 1979).

67. *Id.* § 8322(c).

68. Record at 370–71.

69. 16 U.S.C. § 2601(1) (Supp. III 1979).

70. *Id.*

71. Record at 2182–84.

its rule was " 'reasonably related to the purposes of the enabling legislation.' " [72] Second, not only do we find each of the reasons discussed below to be convincing separately, but these reasons can be weighted cumulatively, which makes their force overwhelming.

Petitioners claim that "[i]nstead of giving fuel use considerations the 'hard look' required by section 201(18)(B), the Commission gave five reasons for not 'looking' at all." [73] However, it is clear here that petitioners are merely playing a semantic game. [74] If the Commission did give reasons for "not looking," that makes its action indistinguishable from a decision not to invoke fuel use criteria when it *had* looked.

More to the point, the Commission actually did give fuel use considerations the "hard look" that petitioners seek; it simply concluded for a variety of reasons which we will now discuss that fuel use criteria were inappropriate. That there will inevitably be differences of opinion as to the wisdom and effect of various policies creating incentives and disincentives for cogeneration is apparent; but it is equally apparent that this court has neither the technical expertise nor the constitutional authority to question on the merits the decisions made by an

executive branch agency properly empowered by Congress. We can do no more than determine whether the law has been followed, and it is clear that the actions of the Commission are within the delegation made to it by Congress.

The Commission held hearings in various cities to gather testimony regarding its proposals, including the desirability of fuel use criteria, and the record is replete with voluminous written comments that were received and considered. Many of those commenting at the hearings agreed with the Commission that stringent fuel use criteria should be avoided. [75] There was also testimony to the effect that a fuel savings requirement would discourage cogeneration. [76] The Economic Regulatory Administration (ERA) elsewhere acknowledged the burden of these requirements by proposing an amendment easing the evidentiary requirement for cogenerators in areas of the country where most utilities burn oil to generate electricity. [77] The ERA determined that oil-fired cogeneration would in many cases result in a net savings of oil. Similarly, the Commission argued that "a restriction on the use of gas or oil for cogeneration, imposed by the Commission, could discourage cogeneration at the lower heat input levels, while not significantly reducing the use of

---

**72.** *Mourning v. Family Publications Serv., Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973).

Note again that we give more deference to FERC here than had Congress explicitly told FERC to weigh some factor. *Cf.* Part II–A, pp. 1232–1236 *supra.* *See also* note 45 and accompanying text *supra.*

**73.** Reply Brief for Petitioners at 49 (footnotes omitted).

**74.** Petitioners' quotation of the Commission's conclusion that "it is not proper to address this fuel use issue within the context of this program" is at any rate misleading when taken from context. Brief for Petitioners at 62. The context of the sentence is the following paragraph (which was reached, moreover, only after several pages of discussion of possible fuel use criteria):

Some of the comments stated that permitting cogeneration facilities to use oil, especially in diesel engines, will use up available air quality increments, thereby preventing

the conversion of large utility oil-fired boilers to coal. As noted above, the Commission believes it is not proper to address this fuel use issue within the context of this program. However, the Commission has not made a final determination regarding the environmental effects of new diesel cogeneration facilities, and is therefore including in these regulations an interim exclusion from qualification of this technology until work on an environmental impact statement has been completed.

Record at 2184 (Order No. 70, issued 13 March 1980).

**75.** Record at 714–15, 774, 1258–59, 2098–99, pp. 71DC2–74DC2 in vol. 1 of D.C. hearings. *See also* Record at 2205–08.

**76.** *See id.* at 2103–2105 (comment of the California Public Utilities Commission).

**77.** 45 Fed.Reg. 53,368 (1980).

oil or natural gas." [78] Petitioners object to the use of "the unquantified and unexplained 'fudge' words 'could' and 'significantly,'" [79] but the problems confronting FERC are of first impression and quite possibly unquantifiable. Moreover, we think it worth noting that the language which petitioner uses in criticizing FERC is similarly unquantified and unexplained.

Petitioners themselves concede that a fuel savings requirement might place a "burden on oil and gas fired facilities," but argue that the burden "need not be substantial." [80] They argue that the Commission could provide for "reasonably limited, streamlined procedures." Petitioners' argument continues: "The requisite information on the cogenerator's fuel use must be known to it in order for it to determine the economic viability of the project, and the utility's fuel use should be known by the state regulatory authority." [81] But, as is clear from petitioners' own language here, burdens *would* be placed on prospective cogenerators. That the burdens may seem small goes again to the weight of the factors relied upon by FERC, not their existence. As we stated before, we need not engage in a weighing process in the matter now before us.

■ Moreover, it is by no means clear that—even assuming arguendo that the petitioners are correct in their assertion that the burdens *should* be perceived as relatively light—that the burdens *would* be perceived as light. The obstacles to cogeneration are both psychological and economic. [82] The Commission could rationally find that it is of paramount importance to remove the *appearance* of regulation as well as its reality. A demonstration by the cogenerator of fuel savings, and the requirements that the prospective cogenerator have

"[t]he requisite information on ... fuel use" and that "the state regulatory authority" be consulted, each entail additional and perhaps substantial psychological barriers to the adoption of cogeneration. FERC could reasonably have concluded that, to avoid the appearance of regulation, a general rule of no fuel use requirements might be preferable to a more complex rule. Encouraging cogeneration by eliminating the appearance of regulation might result in oil and gas savings greater than would be effected were complicated regulations undertaken.

The importance of avoiding additional regulations was especially important in light of the fact that the Commission decided that it would promulgate fuel *efficiency* regulations, to which subject we next turn.

■ We find that the Commission's regulation of fuel *efficiency*—instead of fuel *use*—was a reasoned, adequate response to the charge Congress gave it in section 201 of PURPA. Section 201 mentioned "fuel efficiency" as well as "fuel use" in the same list of requirements that the Commission might prescribe. [83] The Commission made clear its belief that the establishment of minimum efficiency standards for cogeneration facilities would ensure the efficient use of scarce fuels. [84] The Commission specifically observed that so long as cogeneration facilities provide for more efficient use of scarce fuels the national purpose is served. [85] The efficiency standards adopted by the Commission have much the same effect that the fuel use criteria would have, insofar as these efficiency criteria are strictest for cogeneration facilities using oil or gas. [86] The Commission also proposed efficiency standards (although less stringent ones) for facilities using other fuels that are limited in availability such as biomass. It imposed

**78.** Record at 370–71.

**79.** Brief for Petitioners at 65.

**80.** Reply Brief for Petitioners at 54.

**81.** *Id.* at 55 (footnote omitted).

**82.** *See* pp. 1230–1231 and accompanying authority *supra.*

**83.** 16 U.S.C. § 796(18)(B)(i) (Supp. III 1979).

**84.** Record at 372 (proposed regulations) (issued 27 June 1979).

**85.** *Id.* at 2183–84.

**86.** *Id.* at 371–74.

no efficiency standards on facilities using coal or coal-derived fuel, reasoning that "[t]he abundance of this energy resource permits reliance on the market to optimize efficiency."[87] The Commission's proposed efficiency standards are higher for gas and oil in order to ensure that these fuels are put to efficient use.[88] Finally, acknowledging that efficiency standards are not useful for bottoming cycle facilities, the Commission promulgated efficiency standards for such facilities *only* to the extent they use oil or gas for supplementary firing to generate electricity.[89]

The Commission also justified its decision not to invoke fuel use criteria by pointing out that the Department of Energy has authority to restrict the fuel use of those cogeneration facilities which have a design capability of consuming fuel at the rate of at least 100 million BTU's per hour.[90] Thus FERC declared in Order No. 70 that "the Commission does not believe it necessary or appropriate to require an additional layer of fuel use regulation on technologies which the Commission is charged with encouraging and for which another agency has authority to restrict fuel use."[91] Petitioners argue that this reason has attenuated importance since only some cogenerators meet the 100 million BTU's per hour standard. However, the issue before us remains less the weight of FERC's reasons than their existence.

Finally, the Commission reasoned that fuel use criteria were unnecessary since— because the operation of coal-, nuclear-, or hydro-powered generating stations is much less expensive than operating oil- or gas-fired plants—a cogenerator in most places will find it more economical to purchase utility-generated electricity when that power is coal-, nuclear-, or hydro-generated and the cogenerator uses oil or gas. The Commission thus decided that these market forces "rather than an additional layer of Federal fuel use regulation" should determine the appropriate use of oil and gas.[92] Petitioners question the economic model on which the respondents' argument is based. However, it is not for this court to decide among Chicagoan, Austrian, or Harvardian economic models. Again, the only question properly before us is whether the Commission has based this decision on some plausible evidence.

Thus we conclude that the Commission was granted discretion in its decision to invoke or not to invoke fuel use criteria and that its decision not to do so was a reasoned and adequate response to Congress' charge. FERC considered the advantages and disadvantages of such criteria, and concluded that the burdens they would place on cogeneration, the presence of its fuel efficiency criteria, the power of DOE to restrict the fuel use of the larger facilities, and the price of non-petroleum utility power all rendered fuel use criteria unnecessary or undesirable or both.

## III. CONCLUSION

On the four issues before us today we hold: (1) With respect to FERC's "full avoided cost" rule, FERC did not justify and explain its decision to adopt the rule. Its present rule is hereby vacated. Presumably FERC will want to reconsider its whole position on this problem in the light of this opinion. (2) FERC's "simultaneous transaction" rule is left standing, since it is consistent with congressional intent. (3) FERC's grant of blanket authority to cogenerators to "interconnect" with electric utilities without meeting the requirements of sections 210 and 212 of the Federal Power Act, on the other hand, disregards the relevant statutory provisions. The Commission rule granting this authority is hereby vacated. (4) Finally, we hold that

---

**87.** *Id.* at 374.

**88.** *Id.* at 372–74.

**89.** *Id.* at 2217.

**90.** *See, e.g.,* 42 U.S.C. §§ 8302(a)(7)(A)(i), 8302(a)(10)(A)(i), 8311, 8312, 8341, 8342 (Supp. III 1979).

**91.** Record at 2183.

**92.** *Id.* at 2382.

FERC's decision not to invoke "fuel use" criteria in determining what cogeneration facilities are qualifying facilities eligible for the benefits of PURPA is reasoned and in accord with the statute.

*So ordered.*

On Petition for Rehearing and Suggestion for Rehearing En Banc

### ORDER

PER CURIAM.

On consideration of respondent's petition for rehearing and of the brief of the American Paper Institute, Inc., in support thereof, it is

ORDERED by the Court that the petition for rehearing is denied.

A statement of the panel is attached.

### MEMORANDUM

In view of the distortions of the court's opinion served up in the petition for rehearing and suggestion for rehearing en banc filed by the Federal Energy Regulatory Commission (FERC or Commission), we believe it appropriate to restate the essence of the court's decision. FERC attacks two portions of the decision: (1) the disposition of the full avoided cost rule; (2) the rejection of FERC's grant of blanket authority to cogenerators to "interconnect" with electric utilities. The Commission, with respect to both challenges, has read into the opinion much more than the court put there.

As to "avoided cost," FERC charges the court with having declared the Commission's rule "inconsistent with the statute." Petition at 2. The court did no such thing. It simply remanded the matter because the Commission had failed to explain "its rationale and process of consideration." At 1233.* The opinion plainly states that "[t]he Commission may be right in its conclusion, but it needs to make its reasoning and findings explicit." At 1234. Some of the suggested considerations expressed in the opinion may indeed have ready answers.

*See* at 1234–1237. If that is so, it should not be burdensome for FERC to supply them. But the central point made by the court, that FERC never bothered to present a cogent justification of its rule in light of the statutory instructions, at 1232–1235, is not vulnerable to the broadside that the court acted "out-of-bounds." Petition at 10. Nor is a petition for rehearing the proper place to supply the reasoned explanation the court's opinion requires.

FERC takes similar liberties with the court's treatment of the "interconnection" issue. The Commission apparently acknowledges that the court correctly conveyed the literal meaning of the statutory sections in question, but complains that the "necessary consequence" of such a literal reading is to force "full dress evidentiary adjudication." Petition at 14. The "consequence" FERC describes, however, is not inevitable. As the opinion points out: "[T]he Commission need not impose substantial administrative burdens ... but rather can adopt streamlined procedures. If ... even streamlined procedures are too burdensome, the necessary amendment must come from Congress." The court was not insensitive to the objective FERC sought to accomplish, but as the opinion points out, a court is not the proper forum to repair a congressional product that may have been less than fully considered.

Before ROBINSON, Chief Judge, and WRIGHT, TAMM, MACKINNON, ROBB, WILKEY, WALD, MIKVA, EDWARDS, GINSBURG and BORK, Circuit Judges.

### ORDER

PER CURIAM.

Respondent's suggestion for rehearing *en banc* and the brief of the American Paper Institute, Inc., in support thereof have been circulated to the full Court and a majority of the Court has not voted in favor thereof. On consideration of the foregoing, it is

ORDERED by the Court that the aforesaid suggestion is denied.

---

* The court noted particularly that FERC adopted as its rule the upper limit Congress authorized and did not clarify whether it considered and, if so, why it rejected a more flexible approach, for example, "permit[ting] state commissions to set rates within a range—*e.g.*, 80–100 percent [of full avoided cost]—authorized by the Commission." At 1234.

J. SKELLY WRIGHT, TAMM, MacKIN-
NON, ROBB, HARRY T. EDWARDS and
BORK, Circuit Judges, did not participate
in this order.

WALD and MIKVA, Circuit Judges,
would grant the suggestion for rehearing
*en banc.* Their statement is attached.

### Statement of Circuit Judges Wald and Mikva

We would rehear the case *en banc* be-
cause of the importance of the issues to
major new energy programs of cogenera-
tion and small power production and be-
cause of serious doubts over the panel's
resolution of those issues. The main issue
before the court is whether the Federal
Energy Regulatory Commission ("Commis-
sion") acted arbitrarily and capriciously by
choosing a rate that it believed would pro-
vide the greatest incentives for cogenera-
tion, as well as the greatest incentives to
decrease our national reliance on fossil fu-
els, without leading to any increase in rates
paid by electric utility consumers. The
Commission explained that its fully avoided
cost rule would serve these goals.[1] The
panel rejected the Commission's determina-
tion for failure to explain adequately how
utility consumers' interests had been accom-
modated, specifically with respect to rejec-

tion of one particular alternative to fully
avoided costs. As we read the Commis-
sion's opinion, however, it found that the
appropriate balance of statutory interests
had been struck in a rate that would en-
courage cogeneration without raising rates
to consumers. This determination seems
reasonable, and we doubt that any further
explanation, especially in the way of factual
findings, *see* at 1234, was necessary to
satisfy the requirements of the Administra-
tive Procedure Act, 5 U.S.C. § 706(2)(A).[2]

The panel's resolution of the interconnec-
tion issue is also troubling. The panel has
interpreted an incredibly complex and am-
biguous interlace of statutory sections to
require a fullscale evidentiary hearing prior
to any interconnections for the sale or pur-
chase of cogenerated power.[3] In so doing,
it has rejected FERC's alternative interpre-
tation of the statute that would simply pre-
vent the Commission from *requiring* a co-
generator to interconnect without providing
for an evidentiary hearing. The alternative
interpretation is a plausible one and ap-
pears to be more closely in line with Con-
gress' expressed desire to encourage cogen-
eration. This alternative reading should re-
ceive closer scrutiny by this court before it
erects a formidable, perhaps insurmounta-
ble, roadblock to a major energy program.

1. Although the Commission did not expressly address the interests of consumers in its discussion of the fixed percentage method, *see* R. 3460, it discussed the impact of a full avoided cost method on these interests in its discussion of the comments made to the Commission. The Commission stated:

 Although use of the full avoided cost standard will not produce any rate savings to the utility's customers, several commenters stated that these ratepayers and the nation as a whole will benefit from the decreased reliance on scarce fossil fuels, such as oil and gas, and the more efficient use of energy.
 The Commission notes that, in most instances, if part of the savings from cogeneration and small power production were allocated among the utilities' ratepayers, any rate reductions will be insignificant for any individual customer. On the other hand, if these savings are allocated to the relatively small class of qualifying cogenerators and small power producers, they may provide a

 significant incentive for a higher growth rate of these technologies.
 R. 3457–58.

2. The panel's opinion appears to assume that the substantial evidence test governs review of rules promulgated under the Public Utility and Regulatory Policies Act of 1978, Pub.L. No. 95–617, 92 Stat. 3117 ("PURPA"). *See* at 1234 (*citing Public Sys. v. FERC,* 606 F.2d 973 (D.C. Cir.1979)). PURPA, however, does not set forth a heightened standard of review. The avoided cost rule is therefore subject to the general requirements of the APA, and may be overturned if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

3. The panel asserts that the Commission could adopt "streamlined" procedures, *see* at 1240, but fails to explain how anything less than an evidentiary hearing would satisfy the requirements it imports from section 210 of the Federal Power Act, 16 U.S.C. § 824i.